UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ROBERT DALE,

   Plaintiff,               Case No.: 24cv00977

and

MILWAUKEE PAINTERS LOCAL 781 HEALTH FUND,
and UNITEDHEALTHCARE OF WISCONSIN, INC.,

   Subrogated Plaintiffs,

v.

CITY OF CUDAHY,
DANIEL S. GERLITZ,
MICHAEL R. MERUCCI,
ABC DEFENDANT, and
CITIES AND VILLAGES MUTUAL INSURANCE
COMPANY,

   Defendants.

---

**PLAINTIFF'S PROPOSED FINDINGS OF FACT IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT**

---

  Plaintiff, Robert Dale, by his attorneys, Gingras, Thomsen & Wachs, LLP, by Attorneys Isaac P. Huettl and Mark L. Thomsen, submits these Proposed Findings of Fact pursuant to Civil L.R. 56(b)(2)(B)(ii) in opposition to Defendants' Partial Motion for Summary Judgment. (Dkt. 42.) See also Plaintiff's Response to Defendants' Proposed Findings of Fact.

1. On July 6, 2021, just after 9:00 p.m., Robert arrived at his apartment after a long day of work as a union painter. He had been awake since 4:00 a.m. that morning. (Dale dep., p. 7:6-12, 61:2-4.)

1

2. After arriving home, Robert's teenage daughter asked to play outside. While she was playing outside bouncing a ball, she dropped her phone, causing it to dysfunction and accidentally dial 911. (Dale dep., p. 7:12-22.)

3. During the 911 call, Robert provided the dispatcher with his address and name; informed the dispatcher that his daughter was playing outside and cracked the screen, which caused it to accidentally dial 911; and confirmed with the dispatcher that everything was fine. (Pl.'s responses to DPFOF ##2-7.)

4. Robert was frustrated that his daughter dropped the phone because he was worried that he would not be able to afford another phone and because at the time, his daughter was grounded and was not supposed to have her cell phone. (Dale dep., p. 8:10-19.)

5. After the call with the 911 dispatcher ended at approximately 9:20 a.m., Robert fell asleep, as he had to be awake at 4:00 a.m. the next morning for work. (Dale dep., p. 16:2-7, 20-25.)

6. Officer Gerlitz and Officer Merucci arrived at Robert's apartment at approximately 9:24 p.m. (Pl.'s response to DPFOF # 10.)

7. At the time of the incident, neither Officer Merucci nor Officer Gerlitz were wearing a body camera. (Pl.'s response to DPFOF #9.)

8. Upon arriving outside of Robert's apartment door, the officers did not hear anything coming from inside Robert's apartment. (Pl.'s response to DPFOF # 17.)

9. Officer Gerlitz admitted that when Officer Merucci knocked on Robert's door, the officers did not have reasonable suspicion of criminal activity. (Gerlitz dep., p. 5-14.)

10. Robert opened the door, stepped out, and immediately closed the door behind him. (Dale dep., p. 15:5-8, 18:18-21; Pl.'s response to DPFOF #19.)

11. Officer Gerlitz admitted that Robert exiting his apartment and quickly shutting his door is not a crime and is not grounds for an officer to detain an individual. (Gerlitz dep., p. 33:16-18, 34:20-21.)

12. Robert testified that at the time he answered the door, he was "tired," "disoriented," and "exhausted" after a long day of work in the heat. (Dale dep,. p. 16:5-6, 15.)

13. After exiting his apartment, Robert explained to the officers more than once that it was a mistaken 911 call, that they did not need to be there, that nothing happened, and that he was going back into his apartment. (Dale dep., p. 15:13-19, 17:12-22; Pl.'s response to DPFOF #20).

14. During a conversation with the officers outside of his apartment, Robert explained to the officers more than once that there was not an emergency. (Dale dep., p. 20:6-7.)

15. While Robert cursed during his interaction with the officers, at no point during the officers' time at Robert's apartment (either inside or outside of his apartment) did the officers hear Robert's daughter say anything about Robert hurting her or any statements from Robert which indicated that he was threatening his daughter. (Merucci dep., p. 5-13; Pl.'s response to DPFOF # 25.)

16. The officers never asked to check on Robert's daughter or whether they could look inside his apartment. (Dale dep., p. 9:23, 15:13-19, 21:4-12.)

17. Prior to initiating physical contact with Robert, the officers never told Robert why they were detaining him. (Dale dep., p. 14:9-10, 18:3-6.)

18. While the officers told Robert that they were there for a "wellness check," they never told Robert what a "wellness check" meant or who the "wellness check" was for. (Dale dep., p. 1-11.)

19. After explaining to the officers multiple times outside of his apartment that it was an accidental 911 call and that there was no emergency and the officers did not give him any response,

3

Robert believed the "wellness check" was over and turned to return to his apartment. (Dale dep., p. 18:3-18, 20:1-7.)

20. Robert testified that he was not aware of any rule requiring him to wait for officers to tell him the wellness check or investigation was over before he could return to his home. (Dale dep., p. 20:1-2.)

21. Robert turned to return inside his apartment, opening the door with his right hand and stepping across the threshold of his apartment, when Officer Merucci grabbed his left arm. (Pl.'s response to DPFOF # 26, 27, 28; Dale dep., p. 19:21-23, 21:13-19, 20:10-17.)

22. Prior to grabbing Robert's arm, the officers did not inform Robert that he was not free to return inside his home. (Merucci dep., p. 7-9.)

23. Officer Merucci admitted that at the time he grabbed Robert's arm, Robert had not committed a crime. (Merucci dep., p. 9:6-8.)

24. Despite admitting that the officers did not have reasonable suspicion of criminal activity, Officer Merucci testified that they could "stretch disorderly conduct here." (Merucci dep., p. 11:17-24.)

25. At the time Officer Merucci grabbed Robert's arm, Robert had not threatened the officers. (Merucci dep., p. 10:8-9.)

26. Robert refused to allow the officers to pull him back into the hallway, explaining that he "stood fast" with his right hand placed up against the door frame. (Pl.'s Response to DPFOF #33, 36.)

27. After Officer Merucci grabbed Robert outside of his apartment, Robert told his daughter in a "dad to daughter tone" that he was not fighting with the officers and that he was trying to ask why he was under arrest. (Dale dep., p. 24:10-17.)

4

28. Officer Gerlitz tackled Robert to the ground as Robert stood in the threshold of his apartment. (Pl.'s Response to DPFOF #38-41.)

29. Prior to Officer Gerlitz tackling Robert to the ground, Robert never swung at the officers. (Dale dep., p. 24:18-22; Merucci dep., p. 87:22-25, 88:1-4.)

30. At no point did Robert swing at the officers. (Dale dep., p. 18-22.)

31. After Officer Gerlitz tackled Robert to the ground and ended up on top of Robert, straddling his hips, Robert's hands were pinned to his side with his palms wide open. (Dale dep., p. 25:1-7.)

32. Robert's legs were bent up against his couch and the door frame, precluding him from flipping over or swinging his arms or legs. (Dale dep., p. 29:22-25, 30:1, 31:8-14.)

33. While Officer Gerlitz straddled Robert, Officer Merucci was unable to get through the front door because it was not open wide enough for him to get in. (Pl.'s Response to DPFOF #44, 45.)

34. Robert testified that he was "roughly" 300 pounds and 5 foot 10 at the time of the incident. (Pl.'s Response to DPFOF #49.)

35. Officer Gerlitz testified that at the time of his deposition, he was approximately 280 pounds, and at the time of the incident, he was 6 foot 1 and was "probably closer to 255" pounds. (Pl.'s Response to DPFOF #50.)

36. Besides yelling, asking why he was under arrest, and looking around to see what was going on, Robert was motionless on the floor; he was not trying to fight back. (Dale dep., p. 32:6-23.)

37. Robert closed his eyes because he saw a shadow, at which point Officer Gerlitz hit him in the center of his face. (Dale dep., p. 25:7-9.)

38. When Robert told Officer Merucci in the squad car after the incident that he was "being as aggressive as [he] was," Robert was referring to the fact that his language, body language and

5

demeanor were piss poor and that him swearing at the officers was not well appreciated. (Dale dep,. p. 34:6-15, 36:1-2.)

39. After Officer Gerlitz delivered the strike to Robert's face, Robert's first instinct was to put his hands to his face, and his hands were covered in his own blood. (Dale dep., p. 80:4-10.)

40. Robert felt that his nose was displaced, and he tried to alert the officers to the fact that they broke his nose. (Dale dep., p. 80:12-14.)

41. Meanwhile, the officers punched Robert in the back of the head approximately five times and in his ribcage once or twice. (Dale dep., p. 80:15-25, 81:1-3.)

42. Pictured below is a photograph of Robert taken after Officer Gerlitz broke his nose (Gerlitz dep., p. 14:22-25, 15:1-5):



43. The officers did not listen to the 911 call with the dispatcher prior to arriving at Robert's apartment. (Merucci dep., p. 17:3-9) (Gerlitz dep., p. 21:3-6.)

6

44. The officers only knew the information which dispatch passed along, which was that they were responding to an accidental 911 hangup with an agitated caller on the phone. (Gerlitz dep., p. 22:6-9) (Merucci dep,. p. 17:11-20.)

45. The officers admitted that Robert had a right to swear at law enforcement. (Merucci dep., p. 17:21-22) (Gerlitz dep., p. 35: 16-25, 17:1-3.)

46. Neither Officer Merucci nor Officer Gerlitz spoke with Robert's daughter to check on her welfare. (Gerlitz dep., p. 37:11-20, 47:6-7; I.D. depo., p. 10:5-10, 20:3-19).

47. None of Robert's neighbors complained about a disturbance or noise coming from Robert's apartment, and there is no evidence that the officers told Robert he was causing a disturbance. (Merucci dep., p. 39:21:23.)

Dated at Madison, Wisconsin this 30th day of December, 2025.

*s/ Isaac P. Huettl*
Mark L. Thomsen
State Bar No. 1018839
Isaac P. Huettl
State Bar No. 1122828
GINGRAS, THOMSEN & WACHS, LLP
219 N. Milwaukee Street, Suite 520
Milwaukee, WI 53202
Direct Dial: (414) 935-5482
Facsimile: (414) 763-6413
E-Mail: ihuettl@gtwlawyers.com

*Attorneys for Plaintiff*