UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ROBERT DALE,

Plaintiff,

v.

MILWAUKEE PAINTERS LOCAL 781 HEALTH FUND
and UNITED HEALTHCARE OF WISCONSIN,

Involuntary Plaintiffs,

Case No. 24-cv-977-pp

v.

CITY OF CUDAHY, DANIEL GERLITZ,
MICHALE R. MERUCCI, ABC DEFENDANT
and CITIES AND VILLAGES MUTUAL INSURANCE COMPANY,

Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF VICTOR WAHL (DKT. NO. 33) AND GRANTING DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF SCOTT J. HILDEN (DKT. NO. 38)**

---

In December 2025, the parties filed Rule 702 motions in this false arrest and excessive force case, dkt. nos. 33, 38, and the defendants filed a motion for summary judgment, dkt. no. 36. All three motions have been fully briefed. This order addresses the parties' motions to exclude expert testimony. Dkt. No. 33 (the plaintiff's motion to exclude the defendants' expert); Dkt. No. 38 (the defendants' motion to exclude the plaintiff's expert).

## I. Factual Allegations in the Complaint[1]

Plaintiff Robert Dale's claims arise out of an incident that occurred in July of 2021 in Cudahy, Wisconsin. The plaintiff alleges that on July 6, 2021, at around 9:00 p.m., he was at his apartment in Cudahy with his twelve-year-old daughter. Dkt. No. 3-1 at ¶11. He says that as his daughter was playing basketball outside the apartment building, she dropped her phone. Id. at ¶12. Around 9:15 p.m., she came inside the apartment, "upset that she accidentally cracked her phone." Id. at ¶13. The plaintiff avers that because the phone's screen was cracked, it was "going haywire;" he says that in trying to turn off the phone, his daughter accidentally made an "emergency call." Id. at ¶14. At first neither the plaintiff nor his daughter noticed that an emergency call had been made. Id. at ¶15. The plaintiff asserts that thirty-nine seconds into the emergency call, the plaintiff heard the dispatcher's voice coming from the phone; he says that he picked up the phone, told the operator that 911 had been called by accident and said there was no need to send someone to his home. Id. at ¶16.

The plaintiff alleges that at 9:23 p.m., someone knocked on his door. He says that "Cudahy Police Department officers, Defendant Merucci and/or ABC Defendant and/or Defendant Gerlitz, stood staggered on the stairs outside" his apartment. Id. at ¶17. The plaintiff alleges that Merucci was one of the

[1] For purposes of deciding these motions to exclude, the court has recounted allegations from the plaintiff's complaint. Dkt. No. 3-1. In reciting these facts, the court offers no opinion as to whether these facts are disputed for purposes of summary judgment.

responding officers, and Merucci reported that upon arriving at the home, he didn't hear any noise coming from inside the apartment. Id. at ¶18. The plaintiff says that he opened his door, stepped outside the apartment and closed the door behind him. Id. at ¶19. He says he then told officers that he did not need them and he tried to explain that his daughter's phone was cracked and that she'd accidentally called 911. Id. at ¶20. The plaintiff then turned back toward the door to go back into the apartment, reaching for the door with his right hand; he alleges that at that point, Merucci grabbed him by his left arm, preventing him from going through the door. Id. at ¶21. The plaintiff asserts that although there was no probable cause, Merucci told the plaintiff that he was under arrest; he says that when he asked why he was being arrested, Merucci didn't respond. Id. at ¶22. The plaintiff asserts that as he stepped into his apartment to tell his daughter that he didn't do anything wrong, "Defendant Merucci and/or Defendant Gerlitz and/or ABC Defendant" pushed him into the apartment, causing him to fall and to hit his head on a table. Id. at ¶23. The plaintiff says that once he fell to the ground, he was on his back with "Defendant Merucci and/or Defendant Gerlitz and/or ABC Defendant straddling his pelvis." Id. at ¶24.

The plaintiff alleges that while he was on the ground, "ABC Defendant and/or Defendant Gerlitz and or Defendant Merucci" hit him in the face, fracturing his left cheekbone and his nose. Id. at ¶25. The plaintiff says that the officers then repositioned him, pinning him on his stomach; that Merucci threw the plaintiff's table and vacuum across the room; and that the plaintiff's

nose started to gush blood, at which point he tried to use his hands to touch his face. Id. at ¶¶26-28. The plaintiff alleges that at that point, the officers allowed him to roll over and touch his face, which was when he realized that he was covered in blood. Id. at ¶29. The plaintiff asserts that the officers then grabbed his arms and placed them behind his back to cuff him; he says that "throughout this entire process," the officers continued to hit him, both on the back of his head and on his rib cage. Id. at ¶¶30-31. The plaintiff alleges that his daughter was in the room "when [he] was tackled and beat up," and that she begged the officers not to take her father to jail. Id. at ¶32. The plaintiff yelled that his nose was broken; he asserts that the officers "let up" only when they realized the extent of his facial injuries. Id. at ¶33. He says that only after they broke his nose and cheekbone did the officers tell him to stop resisting. Id. at ¶34.

Merucci then called dispatch for an ambulance, which arrived and took the plaintiff (along with Merucci) to St. Luke's South Shore Hospital. Id. at ¶35. The plaintiff says that at the hospital, he was diagnosed with a broken left cheek bone and two breaks in his nose. Id. at ¶36. Merucci then told the plaintiff that he was under arrest for disorderly conduct and resisting an officer. Id. at ¶37. After the plaintiff was cleared to leave the hospital, Merucci took him to the Cudahy Police Station, where he was booked, printed and photographed. Id. at ¶38. The plaintiff included in the complaint a photograph of himself with a swollen nose, blood on his face and what appear to be bloodstains on his shirt. Id. He included what appear to be later photographs of

himself with the beginning of a black eye, a bent and swollen nose and scrapes on his face and back. Id. at ¶39.

## II. Procedural Background

On June 28, 2024, the plaintiff and subrogated plaintiffs Milwaukee Painters Local 781 Health Fund and UnitedHealthcare of Wisconsin, Inc. filed a complaint in Milwaukee County Circuit Court. Dkt. No. 3-1. The plaintiff's first claim for relief is titled "IV. First Claim for Relief Against Defendants Gerlitz, Merucci, and ABC Defendant For." Id. at p. 11. It appears that the plaintiff intended more words to follow the word "for," but the title simply ends with that word; it does not explain what the claim is "for." The paragraphs under the title explain that the officers arrested the plaintiff; that they did not have probable cause to do so; that their conduct "constituted a false arrest, or unreasonable seizure, in violation of [the plaintiff's] Fourth Amendment rights, as incorporated by the Fourteenth Amendment[;]" and that the officers were acting under color of state law. Id. at ¶¶41-44. The claim includes a Wis. Stat. §895.46 indemnification claim against the City of Cudahy for payment of any judgment entered against the individual defendant officers. Id. at ¶46. It thus appears that the plaintiff intended the first claim for relief to be a false arrest claim.

The second claim for relief alleged a 42 U.S.C. §1983 claim against the officers for excessive force. Id. at ¶¶47-54. The third claim alleged that the officers had failed to intervene (which the plaintiff since has conceded the court

should dismiss).[2] Id. at ¶¶55-59. Finally, the plaintiff asserted a claim for punitive damages. Id. at ¶¶60-65. As defendants, the plaintiff named Merucci and Gerlitz, the City of Cudahy, the League of Wisconsin Municipalities Mutual Insurance and a placeholder "ABC Defendant." Id. at 6–7. He named Milwaukee Painters Local Union No. 781 Health Fund and UnitedHealthcare of Wisconsin as subrogated plaintiffs. Id. at 6.

The defendants answered the complaint. Dkt. No. 3-2. Among their affirmative defenses were the defenses that the plaintiff's injuries (if any) were caused by his own acts or omissions. Id. at pp. 8-9.

On August 2, 2024, the defendants removed the case to the U.S. District Court for the Eastern District of Wisconsin, and the case was assigned to this court. Dkt. No. 1. Days later, the parties stipulated that defendant League of Wisconsin Municipalities Mutual Insurance should be dismissed with prejudice and replaced with Cities and Villages Mutual Insurance Company. Dkt. No. 7. The court approved the stipulation. Dkt. No. 8.

The court held a scheduling conference on January 21, 2025. Dkt. No. 26. It issued an order requiring, among other things, that parties wishing to file Rule 702/Daubert[3] and/or dispositive motions must do so by September 30,

---

[2] In a footnote in his December 30, 2025 opposition brief to the defendants' motion for partial summary judgment, the plaintiff stated that he was not contesting the defendants' summary judgment request on the failure-to-intervene claim. Dkt. No. 50 at 6 n.3.

[3] Daubert v. Merrell Down Pharmaceuticals, Inc., 509 U.S. 579 (1993).

2025. Dkt. No. 27. At the parties' request, the court extended that deadline to November 30, 2025. Dkt. No. 31.

A. Parties' Written Submissions

On December 1, 2025, the plaintiff filed a motion asking the court to exclude the opinion of defense expert Victor Wahl. Dkt. No. 33. The motion asked the court to exclude "Victor Wahl's testimony," rather than specifying any particular opinions. But in the supporting brief, the plaintiff argued that the court should exclude Wahl's expert testimony "that there was reasonable suspicion to detain [the plaintiff] or probable cause to arrest [the plaintiff]," because (as the plaintiff framed it) that testimony involved legal conclusions that were outcome-determinative. Dkt. No. 34 at 5. A page later, the plaintiff described three of Wahl's opinions and asked the court to bar Wahl from testifying to them:

> Opinion 1. "At the time [the plaintiff] attempted to flee into his apartment, a reasonable officer would conclude that reasonable suspicion existed to detain [the plaintiff]." (Declaration of Isaac Huettl, Ex. 4, Victor Wahl report, p. 6)
>
> Opinion 2. "[A] reasonable officer would also conclude that probable cause existed to arrest [the plaintiff] for disorderly conduct at that point." (*Id.* p. 7)
>
> Opinion 3. "The emergency doctrine provided Gerlitz and Merucci with legal authority to enter [the plaintiff's] apartment to check [his daughter's] well-being. So [the plaintiff's] behavior also provided Gerlitz and Merucci with probable cause to arrest him for resisting an officer." (*Id.* p. 9).

Id. at 6. The plaintiff concluded by stating, "[t]he Court should preclude Victor Wahl from opining that Corporal Gerlitz and Officer Merucci had reasonable

suspicion to detain [the plaintiff] or probable cause to arrest [the plaintiff].” Id. at 8.

The plaintiff attached to the motion a copy of Wahl’s expert witness report. Dkt. No. 35-4. The report does not contain a numbered list of opinions. The three “opinions” the plaintiff pulled from the report appear at pages 6-9, under the headings “Reasonable Suspicion,” “Probable Cause” and “Emergency Doctrine.” Pages 10-16 of the report fall under the heading, “Use of Force,” a topic the plaintiff did not mention in his motion.

On the same day—December 1, 2025—the defendants filed a motion to exclude expert testimony from the plaintiff’s expert, Scott J. Hilden. Dkt. No. 38. The motion asked the court to exclude “Plaintiff’s Expert, Scott J. Hilden’s testimony . . . ”, without further specification. Id. at 1. The defendants’ supporting brief asserted that Hilden had offered “six opinions about the detention and arrest of [the plaintiff],” as well as the use of force[.]” Dkt. No. 45 at 2. The brief listed the six opinions:

- Opinion 1: The officers failed to adhere to legal standards for detention and arrest.
- Opinion 2: The officers conducted an unlawful entry into the residence.
- Opinion 3: The use of force was unnecessary, disproportionate, and significantly deviated from widely accepted police practice and training.
- Opinion 4: The officers failed to de-escalate the encounter effectively.
- Opinion 5: The basis for the arrest charges is not supported by the facts.
- Opinion 6: Alternative Options.

Id.

Further along in the brief, the defendants mentioned each of the six opinions by number, id. at 7-8, then stated, "[t]hese opinions cross the line[.]" Id. at 9. They asserted that Hilden's first, second and sixth opinions, "and any use of force opinion venturing into legal opinion, should be excluded as offering legal conclusions." Id. at 11. The defendants additionally challenged Hilden's qualifications; argued that the court should not allow him to offer opinions on questions of law; asserted that the court should not allow him to offer opinions and testimony on dismissed or excluded claims or allegations; and asked the court to exclude testimony or opinions on certain guidelines and standards. In the last two sentences of their argument, the defendants stated that "as a matter of qualified immunity, no Wisconsin court has ever held that Wisconsin's officers must follow guidance from" certain sources. The defendants admitted that qualified immunity was a different issue from Daubert, but asserted that "Hilden should not be allowed to guide the jury down a liability path for which the officers would be entitled to qualified immunity." Id. at 15.

The defendants concluded by asserting that the court should not allow Hilden

> to offer opinions on excluded or dismissed claims and allegations, on non-DAAT[4] guidelines as being expressions of the law or of standards by which to judge Officer Gerlitz's use of force, or on legal opinions expressed in his first, second, and sixth opinions in total, or on any opinion venturing into legal opinion, such as the detention, entry, or the use of force

[4] Referencing the Wisconsin Law Enforcement Board's "Defensive and Arrest Tactics—A Training Guide for Law Enforcement Officers."

> being unconstitutional, unlawful, punitive, deliberate or the like.

Id. at 15.

The defendants attached Hilden's expert report. Dkt. No. 39-1. The table of contents, "Section VII Basis for Opinions," listed the six opinions the defendants had recited. Id. at 2. Hilden organized his report by those six opinions: Pages 11-16 related to the first opinion, pages 16-17 related to the second, pages 18-26 related to the third, pages 26-28 related to the fourth, pages 28-30 related to the fifth and pages 30-33 related to the sixth.

On December 22, 2025, both parties filed opposition briefs. Dkt. Nos. 48 (the plaintiff's brief in opposition) and 49 (the defendants' brief in opposition). The defendants pointed out that the plaintiff had not challenged the defendants' expert (Wahl's) qualifications, methodology or reliability, and asserted that the court should dismiss the plaintiff's motion if the court dismissed the plaintiff's false arrest claim at summary judgment. Dkt. No. 49 at 1-2.[5] They argued that even if the court does not dismiss the false arrest claim, the plaintiff is challenging Wahl's "opinions" that the plaintiff deems are actually legal conclusions; the defendants say similar opinions "were offered by Plaintiff's expert, Hilden . . . ." Id. They observed that they had filed a Daubert motion themselves, challenging Hilden's opinions, and asserted that "[t]he

---

[5] On December 1, 2025, the defendants filed a motion for partial summary judgment, asking the court to grant judgment in their favor and dismiss the "claims in the Complaint pertaining to false arrest, failure to intervene, and the excessive force claims involving the initial interactions with [the plaintiff] through taking him to the ground." Dkt. No. 36.

Court's disposition of this issue should apply equally to both experts." Id. They nonetheless attempted to "guide the Court as to what is allowed where, as with both experts, their opinions straddle the line of offering an ultimate legal conclusion." Id.

The plaintiff responded that the court should deny the defendants' motion to exclude Hilden's testimony. Dkt. No. 48. But he asserted that the defendants' "motion does not seek to exclude Chief Hilden's testimony in its entirety," arguing that "Defendants only request that the Court exclude opinions one, two, and six and any use of force opinion venturing into legal opinion." Id. at 1 n.1 (citing Dkt. No. 45 at 11).

The parties filed their reply briefs on January 5, 2026. Dkt. Nos. 55 (the plaintiff's brief) and 57 (the defendants' brief). The plaintiff vehemently disagreed with the defendants' "what's-sauce-for-the-goose" argument, asserting that the court should analyze each expert's opinion separately. Dkt. No. 55 at 1-2. The plaintiff agreed that "neither expert should be able to reach the ultimate conclusion of whether the officers had reasonable suspicion to detain or probable cause to arrest [the plaintiff]." Id. at 2. But he asserted that the defendants' expert offered only impermissible legal conclusions. Id. He argued that his expert's (Hilden) opinions were based on the entire chain of events but asserted that the defendants' expert's (Wahl) "testimony regarding the investigation of the 911 call and initial use of force is inadmissible, regardless of how the Court rules on summary judgment . . . ." Id.

In *their* reply, the defendants insisted that the court should exclude the portion of Hilden's testimony that relied on non-binding guidelines. Dkt. No. 57 at 2. They reiterated that the court should exclude any of Hilden's opinions that included impermissible legal conclusions. Id. at 5. They asserted that the court should either exclude, or limit, Hilden's opinions 1 and 2 because they are legal conclusions. Id. And they argued that the court should "limit" Hilden's third, fourth, fifth and sixth opinions because they contained legal conclusions. Id. at 10. The defendants argued that the court should exclude Hilden's testimony relating to the defendant officers' states of mind or the question of whether the officers are credible. Id. at 12. And they asserted that Hilden should not be allowed to testify about dismissed claims. Id. at 14.

B. May 11, 2026 Hearing

On May 11, 2026, the court held a hearing to try to clarify the parties' arguments. Dkt. Nos. 62, 63.[6] At the time, the court was under the mistaken impression that the plaintiff's first cause of action was an indemnification claim, rather than a false arrest claim. The court was operating under the assumption that the plaintiff's only substantive claim was an excessive force claim.

The court explained that both sides had identified specific opinions that they thought the court should exclude—the plaintiff had asked to exclude three of Wahl's opinions and the defendants had asked the court to exclude six of

[6] The hearing lasted just over thirty-nine minutes; the recording is available at Dkt. No. 62. This order contains a summary of the discussion that took place during the hearing.

Hilden's opinions. The court said that it agreed that some of each of the experts' opinions crossed the line into instructing the jury on how it should decide ultimate issues of fact (what the court called "outcome-determinative" testimony). But it explained that both experts had prepared extensive reports, both of which contained some information that could be helpful to the trier of fact without crossing into telling the jury how it should decide the ultimate issues—testimony about what a DAAT manual is, how officers are trained, how they learn to respond to 911 calls, *etc*. And, the court observed, neither party challenged the qualifications of the other's proposed expert. The court asked the parties to help it understand the extent to which each of them was seeking to present testimony that would help the jury understand how officers are trained versus the extent to which each of them was seeking to present testimony that would instruct a jury on whether there was reasonable suspicion or probable cause. Put another way, the court asked the parties how far they were asking the court to go—to exclude the other party's testimony in its entirety, or to exclude only specific opinions, or to exclude certain pages of the reports.

Counsel for the plaintiff responded that all he was seeking was exclusion of the three of Wahl's opinions he'd identified in his brief. He then said that he was looking to preclude any portions of Wahl's report that referred to those opinions. The court pointed out that counsel had just made two different requests—one asking only to exclude the three opinions, and the other asking to exclude any portion of the report that referred to the subjects of those

opinions. Counsel clarified that he was asking the court to exclude the section of Wahl's report titled "Initial Encounter with [the plaintiff]"—from page 6 of Wahl's report to the top of page 9.

Defense counsel told the court that if it decided to exclude the three Wahl opinions, the defendants would not object, so long as the court also excluded Hilden's opinions 1, 2 and 5 (which, in counsel's view, were opinions on the same topics as Wahl's three opinions). More specifically, defense counsel asked the court to exclude pages 1-16 of Hilden's report (regarding opinion 1), 16-17 (regarding opinion 2) and 28-30 (regarding opinion 5).

The court stated that defense counsel was over-generalizing, observing that some of the information on the pages counsel had identified had to do with officer training (which the court opined was information that could be helpful to the trier of fact). The court inferred that counsel was asking the court to exclude anything in the report that sounded like an opinion about whether there was reasonable suspicion or probable cause.

The court asked the plaintiff's counsel why Hilden's opinion 5—about whether the basis for the arrest charges was supported by the facts—was relevant to the issue of excessive force (which is decided as of the time of the incident). The plaintiff's counsel conceded that the parties did not need to fight over that opinion; he told the court that if the court wanted to strike that opinion, he had no problem with that. But as to Hilden's opinions 1 and 2, counsel argued that excluding the entirety of the sections discussing those opinions would go too far. Counsel argued that Hilden's opinions as to whether

the defendants' conduct deviated from how officers are trained would be relevant to whether they used excessive force. When the court observed that the constitutional issue of whether an officer used excessive force is not based on whether the officer followed procedure or training, counsel responded that the question of what officers are trained to look for and the events that proceed the alleged use of force are relevant to that analysis.

As for Hilden's opinion 3, defense counsel stated that the defendants were seeking exclusion for three reasons: (1) Hilden was opining on the credibility of the officers, which invaded the province of the jury; (2) Hilden's use of words of judgment, such as "unlawful," "illegal" or "unconstitutional," crossed the line into telling the jury how it should decide the ultimate issue and (3) Hilden relied on standards other than the DAAT manual, despite the fact that Wisconsin has not adopted those standards and that officers in Wisconsin are not trained on those standards. Counsel told the court that in filing the motion, the defendants were not trying to "strike in full" Hilden's opinions, but to "clean them up" by "pulling out" the words of judgment and his reliance on non-DAAT standards.

The court asked the parties about the Seventh Circuit's decision in United States v. Brown, 871 F.3d 532, 538 (7th Cir. 2017), in which the appellate court had opined that national policy could be more helpful than local policy in assisting a jury determine how a reasonable officer would act under the circumstances. Defense counsel asserted that that language was dicta and argued that the Seventh Circuit had not held that Wisconsin officers

had to be trained on non-DAAT procedures. Counsel for the plaintiff responded that there was no law supporting the argument that testimony citing non-DAAT standards must be excluded; he argued that non-DAAT standards go to the weight the factfinder should give the testimony. He also asserted that the Brown decision illustrated some of the problems with relying solely on local policies and procedures.

The court asked the defense why it referred to qualified immunity when that was not part of the Daubert analysis. Counsel responded that it was trying to describe the eventual consequence of allowing Hilden to testify about non-DAAT procedures—that if Hilden testified or implied that the defendants' failure to follow non-DAAT procedures meant that they used excessive force, the defendants would respond that there was no clearly established law requiring them to follow non-DAAT procedures and thus that they were entitled to qualified immunity. Counsel also argued that such testimony would "flunk" the Daubert standard, because non-DAAT procedures have not been tested, peer-reviewed or generally accepted in Wisconsin.

Finally, the court asked each attorney what they hoped their expert would tell the factfinders that the factfinders could not figure out using their own common sense. The plaintiff's counsel said that if Hilden points to deviations the defendants made from standard procedures, that would be essential to the jury's determination about how officers should act in high-stress situations. Defense counsel responded that Wahl is an expert on the DAAT manual; he has trained on it for years and can walk the jury through it

(just as Hilden could walk the jury through it). Defense counsel reiterated that the defense had filed its motion for "clean up" purposes, opining that law enforcement experts often deviated from providing helpful information to acting like judges, drawing legal conclusions rather than providing information.

## III. Legal Standards

### A. Law Relating to the Plaintiff's Claims

It is now clear to the court that the plaintiff's substantive first claim for relief is a false arrest claim. Seventh Circuit Pattern Jury Instruction 7.07 lists three elements for a claim of the constitutional tort of false arrest: "1. Defendant arrested Plaintiff. 2. Defendant did not have probable cause to arrest Plaintiff. 3. Defendant acted under color of law." Federal Civil Jury Instructions of the Seventh Circuit (2017 rev.). "A § 1983 claim for false arrest cannot succeed if the officer had probable cause to make the arrest." Peterson v. Pederson, 140 F. 4th 421, 426 (7th Cir. 2025) (citing Mwangangi v. Nielsen, 48 F.4th 816, 825 (7th Cir. 2022)). To decide whether the defendants had probable cause to arrest the plaintiff, a factfinder would need to consider the facts that supported probable cause.

The defendants have taken the position that Officers Merucci and Gerlitz had probable cause to arrest the plaintiff under Wisconsin's disorderly conduct statute (Wis. Stat. §947.01) and resisting/obstructing an officer statute (Wis. Stat. §946.41). See Dkt. No. 42 at 8. Disorderly conduct requires that the state prove "(1) the defendant 'engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct; and (2) the

defendant's conduct 'occurred under circumstances where such conduct tends to cause or provoke a disturbance.'" Pierner-Lytge v. Hobbs, 601 F. Supp. 3d 404, 411 (E.D. Wis. 2022) (emphasis removed) (quoting State v. Schwebke, 253 Wis. 2d 1, 17 (Wis. 2002)). To prove the charge of resisting an officer under Wisconsin law, the state must show that the defendant knowingly resisted or obstructed an officer while the officer was doing an act in an official capacity and with lawful authority. Wis. Stat. §946.41(a).

The plaintiff's second substantive claim for relief is an excessive force claim. "An officer's use of force is unconstitutional if, considering the totality of the circumstances, 'the officer used greater force than was reasonably necessary to make the arrest.'" Jackson v. City of Madison, 176 F.4th 1005, 1023 (7th Cir. 2026) (quoting Becker v. Elfreich, 821 F.3d 920, 925 (7th Cir. 2016)).

> The reasonableness inquiry turns on the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Miller v. Gonzalez*, 761 F.3d 822, 828-29 (7th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 . . . (1989)). Critically, courts assess reasonableness from the perspective of the officer on the scene, factoring in "the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; 'and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances.'" *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (quoting *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018)); *see also Graham*, 490 U.S. at 396-97.

Id.

B. Law Governing the Admissibility of Expert Witness Testimony

Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), govern the admissibility of expert testimony. Under Rule 702, a witness may be qualified as an expert "by knowledge, skill, experience, training, or education." The party seeking to introduce the testimony must establish that it is more likely than not that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," that "the testimony is based on sufficient facts or data," that "the testimony is the product of reliable principles and methods" and that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The court acts as a gatekeeper to ensure that the testimony rests on a reliable foundation and is relevant to the task at hand. Kirk v. Clark Equip. Co., 991 F.3d 865, 872 (7th Cir. 2021) (quoting Daubert, 509 U.S. at 589).

In its gatekeeper role, the court engages in a three-step analysis in deciding whether to allow expert testimony. Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 779 (7th Cir. 2017). The court considers (1) whether the proffered expert is qualified; (2) whether the expert's "methodology is scientifically reliable;" and (3) "whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" Id. (quoting Myers v. Ill. Cent. R.R. Co., 629 F.3d 639, 644 (7th Cir. 2010)). As the Seventh Circuit has phrased it, the court must consider the proffered expert's

qualifications, the reliability of the expert's methodology and the relevance of the expert's testimony. Id. Courts can *sua sponte* consider the admissibility of expert testimony. Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 704 (7th Cir. 2009).

Experts cannot testify "as to legal conclusions that will determine the outcome of the case." Good Shepherd Manor Found v. City of Momence, 323 F.3d 557, 564 (7th Cir. 2003) (Seventh Circuit upheld exclusion of testimony that "was largely on purely legal matters and made up solely of legal conclusions"). That said, an opinion is not automatically inadmissible just because "it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). Experts also may not attempt to instruct the jury on the law; the court alone has that authority. Jimenez v. City of Chicago, 732 F.3d 710, 721 (7th Cir. 2013) ("It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law").

Several times, the Seventh Circuit has addressed the question of experts testifying about concepts like probable cause and reasonable suspicion, and it has discussed how experts may testify about other policing standards. In Florek v. Village of Mundelein, Ill., 649 F.3d 594 (7th Cir. 2011), when analyzing the circumstances under which expert testimony on law enforcement would assist a jury, the Seventh Circuit explained that "expert testimony is more likely to satisfy Federal Rule of Evidence 702's requirement that it 'assist the trier of fact to understand the evidence or determine a fact in issue' when something peculiar about law enforcement (*e.g.,* the tools they use or the

circumstances they face) informs the issues to be decided by the finder of fact." Id. at 602 (citing United States v. Shedlock, 62 F.3d 214, 219 (8th Cir. 1995)). In illustrating this point, the Seventh Circuit cited Kopf v. Skyrm, 993 F.2d 374 (4th Cir. 1993). Id. The court explained that in Kopf, the Fourth Circuit had found that expert testimony would be helpful in explaining how and why law enforcement would use "police dogs and certain specialized devices in gaining control over a suspect," but that expert testimony would be unnecessary in other situations, "such as where police used their bare hands in making an arrest[.]" Id. (citing Kopf, 993 F.2d at 378–79). The Seventh Circuit observed that "when testimony is about matters of everyday experiences, expert testimony is less likely to be admissible." Id. at 602–03 (citing United States v. Hanna, 293 F.3d 1080, 1085–86 (9th Cir. 2002))

A couple of years later, in Jimenez, the Seventh Circuit recognized that "[w]hen an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is 'limited to describing sound professional standards and identifying departures from them.'" 732 F.3d at 721 (quoting West v. Waymire, 114 F.3d 646, 652 (7th Cir. 1997)).

More recently, in Carter v. City of Wauwatosa, 114 F.4th 866 (7th Cir. 2024), the Seventh Circuit considered the use of expert testimony regarding reasonable suspicion. The court explained:

> In this case, the district judge focused the trial on the question of reasonable suspicion. That inquiry required exploration of whether Officer Kaine could "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *United States v. Pace*, 48 F.4th 741, 749

> (7th Cir. 2022) (quoting *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020)). To decide whether reasonable suspicion existed, the jury did not need to determine whether the method of conducting the stop was consistent with best police practices or the City's procedures. Thus, [the expert] would not have had anything "useful to say about the particular circumstances at issue." *Downing*, 48 F.4th at 810. "[E]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 . . . (1993). The district judge did not abuse his discretion in excluding Landers' testimony.
>
> Further, whether Officer Kaine possessed reasonable suspicion sufficient to stop the Lexus was not a particularly complicated inquiry. We are convinced that the jury needed no help from an expert in conducting it. Officer Kaine's suspicion was based on a citizen's tip that a robbery was in progress. Officer Kaine investigated this tip by stopping the Lexus. Whether this tip gave rise to reasonable suspicion is "a matter of everyday experience," where "expert testimony is less likely to be admissible." *Florek*, 649 F.3d at 602–03 (citing *United States v. Hanna*, 293 F.3d 1080, 1085–86 (9th Cir. 2002)). Given the focus of the trial, we cannot conclude that the district judge abused his discretion in excluding Landers from testifying.

Id. at 880.

As for the plaintiff's excessive force claim, in 2017, the Seventh Circuit addressed an excessive force case in which a police officer had "sucker-punched a store employee for no apparent reason" and beat him during a drug investigation at a convenience store. United States v. Brown, 871 F.3d 532, 534 (7th Cir. 2017). The defendant sought to introduce expert testimony from a former police officer, who would testify that the officer's conduct was consistent with the standards of the Chicago Police Department, but the trial court excluded the expert, "reasoning that departmental policy was immaterial to the Fourth Amendment inquiry and that the expert's proposed testimony might include an improper opinion about [the officer's] state of mind." Id. In finding

that the trial court did not abuse its discretion, the Seventh Circuit first emphasized that the decisive question in an excessive force case "is whether the officer's conduct meets the Fourth Amendment's objective standard of reasonableness." Id. (citing Williams v. Indiana State Police Dep't, 797 F.3d 468, 472-73 (7th Cir. 2015). "Ultimately the officer flunks the test if, in light of the circumstances, he 'used greater force than was reasonably necessary to effectuate the seizure.'" Id.

The court then discussed the relationship between the constitutional standard for an excessive force claim and police department procedures or regulations:

> The excessive force inquiry is governed by constitutional principles, not police-department regulations. *Scott v. Edinburg*, 346 F.3d 752, 760-61 (7th Cir. 2003). An officer's compliance with or deviation from departmental policy doesn't determine whether he used excessive force. Put another way, an officer's compliance with the rules of his department is neither sufficient nor necessary to satisfy the Fourth Amendment's reasonableness requirement. Police policies are not nationally uniform; nor are they static. If compliance with departmental policy were decisive, the Fourth Amendment's reasonableness standard would "vary from place to place and from time to time." *Whren v. United States*, 517 U.S. 806, 815 . . . (1996). Worse, if compliance with department policy were the applicable legal standard, the police department itself would become the arbiter of Fourth Amendment reasonableness—a prospect that would have horrified those responsible for the Amendment's ratification. *See Illinois v. Rodriguez*, 497 U.S. 177, 191 . . . (1990) (Fourth Amendment rights were "deemed to precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.") (quotation marks omitted); 1 ANNALS OF CONG. 439 (1789) (Joseph Gales ed., 1934) (James Madison expressing the expectation that the country's "independent tribunals of justice will consider themselves in a peculiar manner the guardians" of the individual liberties secured in the Bill of Rights and that the courts "will be in an impenetrable bulwark against every assumption of power in the Legislative or Executive").

Id. at 536-37.

The Brown court clarified that it is not the case "that evidence of police policy or procedure will *never* be relevant to the objective reasonableness inquiry," and cited its decision in Florek. Id. at 537. It provided an example:

> Expert testimony of this type may be relevant in cases where specialized knowledge of law-enforcement custom or training would assist the jury in understanding the facts or resolving the contested issue. For example, if it's standard practice across the country to train officers to handle a given situation in a particular way, expert testimony about that training might aid a jury tasked with evaluating the conduct of an officer in that specific situation. The legal standard contemplates a reasonable *officer*, not a reasonable person, so it may be useful in a particular case to know how officers typically act in like cases. *Florek*, 649 F.3d at 602.

Id.

But the court went on to make a point relevant to one of the parties' disputes here: "Evidence of purely localized procedure is less likely to be helpful than nationally or widely used policy. The jury's task is to determine how a reasonable officer would act in the circumstances, not how an officer in a particular local police department would act." Id. at 538. The court went on to explain:

> The level of factual complexity in the case may also bear on the relevance of expert testimony about police practices or protocols. In many cases, evaluating an officer's conduct will draw primarily on the jury's collective common sense. The everyday experience of lay jurors fully equips them to answer the reasonableness question when a case involves "facts that people of common understanding can easily comprehend." *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987). The jury's common experience will suffice, for example, when "police use[ ] their bare hands in making an arrest, the most primitive form of force." *Florek*, 649 F.3d at 602 (internal quotation marks omitted). But when "something peculiar about law enforcement (*e.g.*, the tools they use or the circumstances they face)

> informs the issues to be decided by the finder of fact," a juror's everyday experience may not be enough to effectively assess reasonableness. *Id.* If a case involves "a gun, a slapjack, mace, or some other tool, . . . the jury may start to ask itself: what is mace? what is an officer's training on using a gun? how much damage can a slapjack do?" *Kopf v. Skyrm*, 993 F.2d 374, 379 (4th Cir. 1993)

Id.

## IV. The Motions to Exclude

### A. The Plaintiff's Motion to Exclude Testimony from Victor Wahl (Dkt. No. 33)

#### 1. *Wahl's Report*

The defendants' proposed expert, Victor Wahl, is a retired law enforcement officer with thirty years of experience at the City of Madison Police Department ("MPD"). Dkt. No. 35-4 at 2 (Wahl Report). Wahl has a B.A. in sociology and a J.D. from the University of Wisconsin. Id. Wahl had many training and leadership roles while at the MPD, including as Acting Chief of Police, Assistant Chief of Police, pre-service academy instructor, lead instructor for impact projectile, overseer of the taser program and lieutenant of MPD's Professional Standards & Internal Affairs. Id. at 2–3. Wahl currently serves as a senior advisor for the Center for Naval Analyses Institute for Public Research, works for the Center for Justice Research and Innovation and is a member of the Police Executive Research Forum (PERF) and the International Association of Chiefs of Police (IACP). Id. at 3.

Wahl states that he relied on the evidence available in the case to come to his opinions. Id. at 4–5. His report opines on reasonable suspicion, probable cause, the emergency doctrine and use of force. Id. at 6–16. Wahl relies on the

Wisconsin Department of Justice Law Enforcement Standards Board's Defensive and Arrest Tactics (DAAT) training system, Wisconsin court cases, Wisconsin Department of Justice Law Enforcement Standards Board's guide on Constitutional Law and his own experience on what officers are "generally trained on" to come to his conclusions. Id.

As the court has explained, out of Wahl's sixteen-page report, the plaintiff has asked the court to exclude three of Wahl's opinions:

> Opinion 1. "At the time [the plaintiff] attempted to flee into his apartment, a reasonable officer would conclude that reasonable suspicion existed to detain [the plaintiff." (Declaration of Isaac Huettl, Ex. 4, Victor Wahl report, p. 6.)
>
> Opinion 2. "[A] reasonable officer would also conclude that probable cause existed to arrest [the plaintiff] for disorderly conduct at that point." (*Id.* p. 7.)
>
> Opinion 3. "The emergency doctrine provided Gerlitz and Merucci with legal authority to enter [the plaintiff's] apartment to check [his daughter's] well-being. So [the plaintiff's] behavior also provided Gerlitz and Merucci with probable cause to arrest him for resisting an officer." (*Id.* p. 9.)

Dkt. No. 34 at 5 (citing Dkt. No. 35-4). At the May 12, 2026 hearing, the plaintiff's counsel clarified that he was asking the court to exclude everything on pages 6-8 and the three sentences at the top of page 9 of Wahl's report.

The plaintiff argues that these opinions are legal conclusions on ultimate issues of the case. Id. at 3. He contends that whether the officers had reasonable suspicion or probable cause is outcome determinative for his claims and "are necessary elements of [the plaintiff's] allegations that Defendants violated his Fourth Amendment rights." Id. at 5 (citing Carter, 114 F.4th at 880 and Seventh Circuit Pattern Jury Instructions 7.06–7.07 (2023 ed.)).

The defendants respond[7] that Wahl's testimony explains officer training and applies those training standards to the facts of the case, arguing that the testimony will assist the jury in making its decision. Dkt. No. 49 at 3–4 (citing Brown, 871 F.3d at 537). They also argue that the court should not exclude Wahl's testimony merely because "it embraces an ultimate issue to be decided by the trier of fact." Id. at 4 (quoting Florek, 649 F.3d at 602). The defendants assert that the relevant inquiry is whether the testimony would assist the jury in deciding the case. Id. (citing Brown, 871 F.3d at 537).

The defendants maintain that the plaintiff's reliance on Carter is misplaced, arguing that the Seventh Circuit "did not announce a categorical rule barring police-practices experts from testifying in cases involving reasonable suspicion." Id. at 6 (citing Carter, 114 F.4th at 880). Rather, the defendants argue, the Carter opinion confirmed that courts must make admissibility decisions on a case-by-case basis. Id.

The defendants disagree with the plaintiff's characterization of Opinion 2 ("[A] reasonable officer would also conclude that probable cause existed to arrest Dale for disorderly conduct at that point."). Id. at 9. The defendants argue that Wahl is not opining that the officers had "probable cause as a matter of law or instruct[ing] the jury on the applicable legal standard." Id. They assert that Jimenez supports their position, positing that "[w]hile Wahl's opinions implicate legal concepts like probable cause, *Jimenez* makes clear that

[7] The defendants organize their responsive arguments by the three opinions the plaintiff seeks to exclude, but most of their arguments are applicable to all the opinions. Dkt. No. 49 at 3–10.

this overlap does not automatically transform testimony regarding probable cause into an impermissible legal conclusion." Id. at 8–9 (citing Jimenez, 732 F.3d at 721–22). The defendants argue that this opinion is not outcome-determinative. Id. at 9 (citing Sanders v. City of Chicago Heights, Case No. 13-cv-0221, 2016 WL 4417257 (N.D. Ill. Aug. 19, 2016)). The defendants make similar arguments for the third opinion (the opinion that "[t]he emergency doctrine provided Gerlitz and Merucci with legal authority to enter [the plaintiff's] apartment to check [his daughter's] well-being," dkt. no. 35-4 at 9). They argue that Wahl's testimony about how officers are trained to respond to 911 calls (and how they are trained to figure out whether someone needs assistance) would help the jury understand how the defendants perceived the plaintiff's conduct—swearing at someone during the 911 call, the way he came out of the apartment, his behavior in the hallway, his refusal to allow officers to conduct a welfare check of his daughter. Dkt. No. 49 at 10–11. They also contend that Wahl's interpretation of the Wisconsin resisting and obstructing statute is not a legal opinion—it is simply a reference to statutory language in describing the framework officers would be relying on when performing their duties. Id. at 11.

In reply, the plaintiff repeats arguments from his initial brief. Dkt. No. 55. He reiterates his primary contention that Wahl's opinions constitute impermissible legal conclusions. Id. The plaintiff also argues that the Florek decision supports his position, asserting that Wahl's testimony seeks to directly instruct the jury on a particular legal conclusion. Id. at 3.

### 2. *Analysis of Wahl's Testimony*

The plaintiff's insistence that Wahl cannot testify about ultimate issues paints with too broad a brush and is contradicted by Fed. R. Evid. 704(a), which states that "[a]n opinion is not objectionable just because it embraces an ultimate issue." The Seventh Circuit's prohibition is more narrowly tailored; it has held that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." Good Shepherd Manor Found., Inc., 323 F.3d at 564 (citing United States v. Sinclair, 74 F.3d 753, 757 n.1 (7th Cir. 1996)). And "[w]hen an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is 'limited to describing sound professional standards and identifying departures from them.'" Jimenez, 732 F.3d at 721. Nor may the expert "instruct the jury on the applicable principles of law." Id.

The plaintiff asks the court to consider whether the information on pages 6-9 of Wahl's report constitutes testimony as to legal conclusions that will determine the outcome of the case, or whether the information equates to Wahl attempting to usurp the court's role in instructing the jury on the applicable legal principles. The court agrees that the three opinions the plaintiff contests—and the surrounding information on pages 6 through 9 of the report—state conclusions of law. For example: the existence of probable cause is an absolute defense to the plaintiff's false arrest claim (see Pryor v. Corrigan, 124 F.4th 475, 486 (7th Cir. 2024)); Wahl's opinions on the existence of probable cause constitute conclusions about outcome-determinative legal

issues. The opinions Wahl expresses on pages 6 through 9 of his report constitute conclusions—instructions, even—on how the jury should rule on outcome determinative issues. If the court were to allow Wahl provide these opinions, Wahl essentially be telling the jury how to rule on the plaintiff's false arrest claim as a matter of law.

Opinion 1 appears in the section of Wahl's report titled "Reasonable Suspicion." Dkt. No. 35-4 at 6. Wahl begins this section with his opinion, stating "[a]t the time that [the plaintiff] attempted to flee into his apartment, a reasonable officer would conclude that reasonable suspicion existed to detain [the plaintiff]." Id. Only after stating that conclusion does Wahl attempt to explain the professional standards upon which he relies to draw it. Id.

The section of Wahl's report titled "Probable Cause" begins the same way; this is where the plaintiff got Opinion 2. Id. at 7. Wahl concludes that "[a] reasonable officer would also conclude that probable cause existed to arrest [the plaintiff] for disorderly conduct at that point." Id. Wahl then defines and analyzes Wisconsin's disorderly conduct statute and concludes that the officers had probable cause to arrest the plaintiff. Id. at 7–8. He does the same in the "Emergency Doctrine" section of the report (Opinion 3). Id. at 8. For both, and without citing any training or standards, he opines on what officers "generally trained on" regarding 911 calls. Id.

Pages 6 though 9 of the report are rife with attempts to instruct the jury on the law and to make other legal conclusions. On those pages, Wahl either is making a legal conclusion or attempting to instruct the jury on the law. Id. at

6–9. Wahl twice defines reasonable suspicion and describes the facts of the case that, to him, "were clearly suspicious circumstances." Id. at 6–7. He cloaks his legal instructions with the phrase "officers are generally trained that," but still he offers his own definitions of legal concepts with citations to Wisconsin case law. And he does not explain where the "general training" comes from. Id. (citing State v. Waldner, 206 Wis. 2d 51 (Wis. 1996)). There is ample ground to exclude pages six through nine of Wahl's report on the grounds that the opinions he provides are legal conclusions, attempts to instruct the jury on the law and lack any citation of relevant police training or standards.

The plaintiff has not asked the court to exclude any of the portions of Wahl's report relating to the plaintiff's excessive force claim. But in its gatekeeper role, the court has concerns about some of those. The first page of Wahl's "Use of Force" section—the balance of page 9 of his report—is the most problematic. He drops any pretense that he is explaining what "officers are generally trained on" and baldly explains his view of the law. Id. He attempts to break down the Supreme Court's decision in Graham v. Connor, 490 U.S. 386 (1989). Id. He cites and explains the Wisconsin privileged conduct statute and says that he will explain the self-defense statute (although he never does). Id. He writes that

> [w]hile this is a civil case in federal court, these Wisconsin statutes are relevant to the analysis for several reasons. First, the privilege and self-defense statutes are incorporated into use of force training for new officers, to provide legal background for their actions and to incorporate into their decision making. Also, the privilege statute clearly incorporates the reasonableness standard into its language

> ("apparently authorized and reasonable fulfillment of any duties of a public office," "a reasonable accomplishment of a lawful arrest"). Finally, these statutes clearly guide the circumstances under which anyone—not just law enforcement officers—are [sic] legally permitted to use force. The fact that a particular use of force is statutorily lawful—even if applied by a civilian—certainly supports the reasonableness of the same act when engaged in by a law enforcement officer.

Id.

The rest of Wahl's report—pages 10 through 16—lays out the Wisconsin Department of Justice Law Enforcement Standards DAAT training system and de-escalation and applies it to the officers' conduct. Id. at 10–16. Even this section contains legal conclusion. He instructs on the constitutional "objective reasonableness" standard for analyzing excessive force claims, then opines that the DAAT system "provides a framework to help officers make use of force decisions and to analyze the reasonableness of those decisions." Id. at 10. He states that "Gerlitz and Merucci had clear legal authority to control [the plaintiff] during this encounter." Id.

Beyond these concerns, as the court will explain in more detail below, it is not clear how Wahl's testimony about the DAAT manual would assist the trier of fact in determining whether the defendants' conduct met the objective reasonableness standard—whether they used more force than was reasonably necessary to effectuate the seizure of the plaintiff. The Brown case is instructive. The defendants appear to want to call Wahl to explain how their actions comported with the DAAT standards. But compliance with or deviation from departmental policies or standards is not the issue when deciding whether defendants committed the constitutional tort of excessive force. So it is

not clear what "specialized knowledge of law-enforcement custom or training" Wahl would provide that would "assist the jury in understanding the facts or resolving the contested issue." Brown, 871 F.3d at 537. Like the facts in Brown, the facts here are "easily comprehensible." The defendants are accused of having grabbed the plaintiff, forced him to the ground and then beaten him, as well as having arrested him without probable cause. There are no allegations that the defendants used any specialized tools or techniques that would require expert explanation. It is not clear what Wahl's testimony about the DAAT standards would add that the jurors couldn't figure out themselves by listening to the testimony and using their own experiences and common sense.

B. The Defendants' Motion to Exclude Testimony from Scott Hilden (Dkt. No. 45)

1. *Hilden's Report*

According to his report, Hilden is a "seasoned law enforcement professional[.]" Dkt. No. 39-1 at 3. In addition to holding a B.A. in criminal justice from Michigan State University and a master of liberal studies from Eastern Michigan University, Hilden has served in high-level roles in several municipal law enforcement entities in Michigan over his thirty-three-year career. Id. Hilden asserts that he is a member of several law enforcement groups and has extensive experience and training in "Arrest and Detention," "Use of Force/Defensive Tactics," "Training," "Police and Procedures" and "Management and Supervision." Id. at 4–6. Hilden states that he has provided expert testimony in three other federal cases over the past two years. Id. at 6.

Hilden explains that in coming to his conclusions, he relied on practices, policies and standards established by "organizations like" the International Association of Chiefs of Police ("IACP"), the Commission on Accreditation for Law Enforcement Agencies ("CALEA") and the Police Executive Research Forum ("PERF"). Id. at 7. Hilden states that he "evaluated whether the officers had lawful justification for the arrest" and "examined whether the officers' actions were reasonable, necessary, and proportional to [the plaintiff's] conduct." Id. at 8. Hilden asserts that although he uses legal terms, "[a]ny final determinations remain the responsibility of the court and fact-finders." Id. at 9.

After reviewing the relevant documents in this case, Hilden expressed the six opinions the court previously described:

> Opinion 1: The officers failed to adhere to legal standards for detention and arrest.
>
> Opinion 2: The officers' forced entry into the residence was inconsistent with accepted police practices and training.
>
> Opinion 3: The use of force was unnecessary, disproportionate, and significantly deviated from widely accepted police practice and training.
>
> Opinion 4: The officers failed to de-escalate the encounter effectively.
>
> Opinion 5: The arrest charges are inconsistent with the facts and deviate from standard police charging practices.
>
> Opinion 6: Alternative Options.

Id. at 11–32.

The defendants argue that several of these opinions verge on conclusions of law. Dkt. No. 45 at 7. They contend that much of Hilden's "report contains final conclusions, phrases, and thoughts about illegal or unlawful conduct." Id.

The defendants observe that the plaintiff's counsel asked Hilden to review the Seventh Circuit Pattern Jury Instructions on the plaintiff's claims. Id. at 7. Though they admit that this does not impact the admissibility of his testimony and that the instructions "did not change his opinions in this case," the defendants argue that the instructions "underscore the misuse of police practices experts in the courtroom." Id. They say this is because the "judge is the only legal expert in the courtroom, and the jury is the only decisionmaker on how the law applies to the facts;" they say that Hilden holds neither of those roles. Id.

The defendants identify several portions of Hilden's report that they claim state legal conclusions. Id. at 7. Specifically, the defendants argue that "Hilden's first, second, and sixth opinions in total, and any use of force opinion venturing into legal opinion, should be excluded as offering legal conclusions." Id. at 11. The defendants assert that the first, second and sixth opinions opine on topics that "are clearly for the judge." Id. They argue that by using non-Wisconsin guidelines to assess the officers' use of force, Hilden is "opining on what he believes the law should be." Id. The defendants also argue that in his third opinion, Hilden makes a credibility determination. Id. at 8. The defendants argue that the court should not allow Hilden to offer opinions relevant to claims that the court may dismiss at summary judgment. Id. at 12–13.

For the non-Wisconsin guidelines argument, the defendants contend that the court should exclude any of Hilden's opinions that are based on non-DAAT

law enforcement guides. Id. at 13. The defendants argue that the non-DAAT opinions do not satisfy the first, second and fourth Daubert "intellectual rigor" criteria because Wisconsin law enforcement agencies do not use non-DAAT standards. Id. at 13–14. The defendants argue that in using non-DAAT standards, Hilden is providing a legal opinion because "the bottom line is he is making an expression of what the law should, or could be, or might one day be." Id. at 15.

The defendants make this final argument:

> Lastly, as a matter of qualified immunity, no Wisconsin court has ever held that Wisconsin's police officers must follow guidance from the non-DAAT guidelines. While qualified immunity is a separate issue from the *Daubert* analysis of expert opinions, suffice it to say, Hilden should not be allowed to guide the jury down a liability path for which the officers would be entitled to qualified immunity.

Id. at 15.

The plaintiff responds that the defendants' argument that the court should limit Hilden to reliance only on DAAT standards is "unfounded." Dkt. No. 48 at 6. The plaintiff points out that the Seventh Circuit completely rejected this kind of argument in Brown, 871 F.3d at 536–38, quoting that case: "Evidence of purely localized police procedure is less likely to be helpful than nationally or widely used policy." Id. at 6–7. The plaintiff also disputes the defendants' contention that in relying on non-DAAT standards, Hilden was making a legal conclusion. Id. at 7–8. The plaintiff asserts that the standards upon which Hilden relies are broadly accepted across the country. Id. at 8. He also cites a Third Circuit case that found it was reversable error for a district court to exclude expert testimony because it relied on national, rather than

local standards. Id. at 8–9 (citing Wood v. Showers, 822 F. App'x 112, 127–28 (3d Cir. 2020).

The plaintiff argues that Hilden's opinions are not legal conclusions. Id. at 11. He contends that in Opinions 1 and 2, Hilden identifies departures from standard police procedure. Id. at 12. The plaintiff argues that in the event the court finds some of Hilden's statements to be legal conclusions, the court should exclude only that particular language. Id. at 13–14.

The plaintiff asserts that the court should not exclude Hilden's testimony regarding use of force and alternatives because he used proper standards and explained how the officers' conduct departed from them. Id. at 14–15.

The plaintiff spends several pages distinguishing each case the defendants cited in their brief. Id. at 16–22. The plaintiff also argues that the fact Hilden reviewed some of the Seventh Circuit Jury Instructions does not affect the admissibility of his testimony. Id. at 22–23. He asserts that Hilden did not make a credibility determination. Id. at 23–24. The plaintiff argues that the court should not exclude Hilden's testimony even if it dismisses the plaintiff's false arrest or portions of his excessive force case. Id. at 24–28.

In reply, the defendants attempt to counter the plaintiff's argument that Brown defeats their contention that Hilden should not be allowed to testify using non-DAAT sources. Dkt. No. 57 at 2–3. The defendants contend that the DAAT standards are not "local" because they apply statewide. Id. at 3. They continue to argue that the IACP, PERF, CALEA and National Consensus

policies are aspirational and do not apply to Wisconsin police officers. Id. at 3–4.

The defendants reiterate their arguments that many of Hilden's opinions are inadmissible legal conclusions, that he attempts to make credibility determinations and that the court should exclude testimony made irrelevant by summary judgment. Id. at 5–7.

2. *Analysis of Hilden's Testimony*

Hilden's report, while not as blatantly conclusory as Wahl's, contains legal conclusions. But Hilden's report is closer to what Jimenez says is the proper role for experts in these cases: Hilden identifies police standards and explains how he believes the officers' conduct failed to meet them. See Dkt. No. 39-1; see Jimenez, 732 F.3d at 721 (experts may describe "sound professional standards and identify departures from them").

Starting with the portions of Hilden's testimony that the defendants argue are legal conclusions, in "Opinion 1" of his report, Hilden applies the Cudahy Police Department's Use of Force Policy and the IACP's model policy to the facts of the case and concludes that the officers' conduct departed from those standards. Dkt. No. 39-1 at 11–16. This section contains several potentially problematic statements. In the first paragraph, Hilden writes, "the officers' initial seizure of [the plaintiff] did not follow law enforcement protocols of establishing the reasonable suspicion required by law." Id. at 11. This statement skirts dangerously close to concluding that the officers did not have reasonable suspicion. Later on, Hilden refers to Opinion 1 as establishing that

"the officers' initial seizure of [the plaintiff] was not supported by reasonable suspicion." Id. at 29. As the court said in analyzing the plaintiff's motion to exclude parts of Wahl's testimony, the existence of reasonable suspicion and probable cause is outcome determinative.

At the end of the section, Hilden provides a "Summary of Relevance" that contains legal conclusions. Id. at 16. He writes:

> This testimony is critically relevant because it establishes from the officers' own testimony that the initial seizure of [the plaintiff] was unlawful. It lacked the foundational reasonable suspicion required by the Constitution, national policing standards like the IACP Model Policy, and their own department's policy. This unlawful detention set in motion and tainted every subsequent action the officers took.

Id. Hilden concludes that the seizure was "unlawful" because it lacked the "reasonable suspicion required by the Constitution." Id. He again refers to the arrest as "unlawful" when he asserts that it "tainted every subsequent action the officers took." Id. These are legal conclusions and verge on instructing the jury on the law.

Hilden's next opinion, "Opinion 2," analyzes police standards, save for one line. Id. Hilden asserts that "[t]he officers' decision to force their way into [the plaintiff's] residence represented a significant deviation from the law and widely accepted police practices and training regarding warrantless entries." Id. Hilden's assertion that the officers' decision "represented a significant deviation from the law" verges on a legal conclusion. Aside from that sentence, Hilden lays out the relevant police training and standards and identifies ways in which the officers' conduct did not align with it.

For the Opinion 6 (the last specific opinion that the defendants argue contains legal conclusions), Hilden offers a number of "alternative options" to many of the officers' actions. Id. at 31–33. Hilden asserts that the officers had "safer, more professional, and constitutionally appropriate options available" and says that "repeated failure to use these options shows a clear deviation from the law and accepted police practices and training[.]" Id. at 31.

Hilden offers four alternative actions. Id. at 31–33. He contends that at the initial contact with the plaintiff the officers could have de-escalated and communicated with the plaintiff instead of intensifying the situation. Id. at 31. Hilden opines that instead of physically arresting the plaintiff, the officers could have continued to investigate the situation. Id. Likewise, Hilden states that the officers could have avoided a physical confrontation by deescalating and reassessing "alternative options." Id. Finally, Hilden asserts that the officers' use of force "was inconsistent with their training" and that they "had a clear set of alternatives they failed to employ." Id. at 32. Those alternatives are: "De-escalation and Verbal Commands"; "Empty-Hand Control Techniques"; and "Intermediate Weapon (Taser)." Id.

Hilden's alternatives are not legal conclusions, but his contentions about what is "constitutionally appropriate" and how the officers' failure to follow the alternatives "shows a clear deviation from the law" cross the line into legal conclusions. These statements amount to telling the jury that the officers are liable to the plaintiff.

The defendants contend that "[b]edrock principles in use of force law include the fact officers are not required to engage in alternative measures or lesser degrees of force, and Wisconsin officers under DAAT are taught as much[.]" Dkt. No. 45 at 11. The defendants do not cite a source for this "bedrock principal;" even if they had, Hilden does not assert that officers must engage in alternatives measures at the outset, but rather that, judged after the fact, the alternatives illustrate the alleged unreasonableness of the officers' conduct.

Although the defendants did not identify them in their written brief, there are other portions of Hilden's testimony that are problematic. In Opinion 5, Hilden opines that the charges of "Resisting an Officer and Disorderly Conduct filed against [the plaintiff] are not supported by the facts reported by the officers themselves." Id. at 29. Hilden states that "[u]nder Wisconsin law, a key element of this offense is that the officer must be acting with lawful authority." Id. He reiterates from Opinion 1 that the officers did not have reasonable suspicion to seize the plaintiff and concludes that "[t]herefore, any subsequent commands related to that seizure would not be considered lawful." Id. This is a legal conclusion about the existence, or lack thereof, of reasonable suspicion mixed with an instruction on the law used to conclude that the plaintiff could not have been guilty of resisting an officer, but it is irrelevant. Id. At the May 2026 hearing, the court was unaware of the false arrest claim, and so concluded that this opinion was irrelevant to the excessive force claim. Reviewing it now, with the understanding that the plaintiff's first claim is a

false arrest claim, the court concludes that it is a legal conclusion. As part of his opinion on disorderly conduct, Hilden states that disorderly conduct "typically requires conduct that causes a public disturbance." Id. This is an instruction on the law and thus usurps the function of the court.

As for the defendants' credibility argument, Hilden makes the following statement in Opinion 3:

> In response to this non-assaultive resistance, Corporal Gerlitz states the subsequent strike was not aimed at its eventual point of impact, stating,
>
> *"This was not the intended target. I was intending to hit the upper torso area, not his face."* (Gerlitz Depo., p. 15).
>
> The jury will determine if his claim that the head was not his intended target is credible. Still, from an instructor's perspective, an elbow strike from a top position is a powerful and committed gross motor skill. To suggest a trained officer would "accidentally" deliver such a blow to the head defies the core principles of targeting and body mechanics.

Dkt. No. 39-1. The defendants argue that the court should exclude this statement because at bottom, it constitutes a credibility determination and thus invades the province of the jury. The defendants are correct; as Hilden himself concedes, witness credibility is the province of the jury. See Goodwin v. MTD Prods., Inc., 232 F.3d 600, 609 (7th Cir. 2000) ("credibility questions are within the province of the trier of fact, in this case a jury."). Hilden's opinion crosses the line into his making a credibility determination, something he seems to acknowledge with his statement that the jury will make the credibility determination. His opinion is tantamount to telling the jury that they cannot believe Officer Gerlitz's testimony.

The defendants make a global argument that any time Hilden uses a non-DAAT or non-Wisconsin source for judging use of force or any other opinion, he makes a legal conclusion. Id. at 13–15. The court disagrees. As the plaintiff points out in his response brief, the Seventh Circuit rejected this line of reasoning in Brown:

> The excessive-force inquiry is governed by constitutional principles, not police-department regulations. *Scott v. Edinburg*, 346 F.3d 752, 760–61 (7th Cir. 2003). An officer's compliance with or deviation from departmental policy doesn't determine whether he used excessive force. Put another way, a police officer's compliance with the rules of his department is neither sufficient nor necessary to satisfy the Fourth Amendment's reasonableness requirement. Police policies are not nationally uniform; nor are they static. If compliance with departmental policy were decisive, the Fourth Amendment' s reasonableness standard would "vary from place to place and from time to time." *Whren v. United States*, 517 U.S. 806, 815 . . . (1996). Worse, if compliance with departmental policy were the applicable legal standard, the police department itself would become the arbiter of Fourth Amendment reasonableness—a prospect that would have horrified those responsible for the Amendment's ratification. *See Illinois v. Rodriguez*, 497 U.S. 177, 191. . . (1990).

871 F.3d at 537–38. Although DAAT is not exclusively a departmental policy, the analysis is the same. Moreover, the court in Brown also stated that:

> Evidence of purely localized police procedure is less likely to be helpful than nationally or widely used policy. The jury's task is to determine how a reasonable officer would act in the circumstances, not how an officer in a particular local police department would act.

Id. at 538. Brown defeats the defendants' argument.

The rest of the defendants' arguments are similarly unpersuasive. First, they argue that the non-DAAT guidelines cannot be tested because "neither the Wisconsin DOJ, Cudahy, nor Wisconsin law enforcement generally follows these non-DAAT guidelines." Dkt. No. 45 at 14. They next argue that "because

the Wisconsin DOJ has not reviewed, adopted, or published any of these non-DAAT guidelines[,]" the guidelines have not been subjected to peer review or publication. Id. For the same reason, they argue that the non-DAAT guidelines have not been "generally accepted" in the relevant community. Id. These arguments are without merit or authority and do not provide any reason to believe that IACP, CALEA, PERF and National Consensus standards do not meet the relevant Daubert criteria. See Dkt. Nos. 39-1 at 8–9, 39-2, 39-3, 39-4, 39-5. The defendants' own expert, Wahl, is a member of PERF and IACP. Dkt. No. 35-4 at 3.

The defendants' qualified immunity argument is particularly perplexing. The defendants have cited no authority for the proposition that a court should exclude expert witness testimony because it might have some collateral impact on another issue. And here, the question of whether the officers followed IACP, CALEA or PERF policy is only tangentially relevant to the question of whether the officers had probable cause to arrest the plaintiff, or whether the amount of force they used was objectively reasonable. As the Seventh Circuit said in Brown, the question is whether the use of force was more than necessary from the perspective of a reasonable officer, not a reasonable officer in Wisconsin.

Also complicating the analysis is the way the defendants framed their motion to exclude. In their written materials, they advised the court that they objected to Hilden's Opinions 1, 2, 3 and 6. During the May 2026 hearing, they orally advised the court that they objected to Opinions 1, 2, 3 and 5. They identified the pages of Hilden's report that they wanted excluded (pages 1

through 16 of Hilden's report regarding Opinion 1, pages 16 through 17 regarding Opinion 2 and pages 28 through 30 regarding Opinion 5), but also told the court that they were not asking the court to exclude Hilden's testimony altogether, but rather to "clean it up" by "pulling out" judgment words and references to non-DAAT standards.

C. Helpfulness to the Jury

Above, the court has considered the parties' specific objections. But as the court has observed, neither party appears to be asking the court to exclude the other side's expert testimony in its entirety, or to exclude Wahl or Hilden as expert witnesses. In other words, both parties assume that expert witness testimony is necessary to assist the jurors. It is not clear why.

This case will require the jury to do two things. First, it will require the jury to do something that jurors do every day across the country—assess the credibility of the parties and other witnesses. A review of the summary judgment briefing (which the court will address in a separate order) reveals that the parties have competing views as to whether the officers had probable cause to believe that the plaintiff had engaged in disorderly conduct or was resisting the officers at any point, as well as whether the level of force the officers used at each stage of the encounter was reasonable. If the jury believes the officers, they likely will come to different conclusions on these questions than if it believes the plaintiff. Those decisions will be based on witness descriptions of the events and on the jury's experience and common sense.

Second, once the jury makes its credibility determinations, it will be required to determine whether the facts show that the officers had probable cause to arrest the plaintiff for disorderly conduct and resisting arrest, and whether the amount of force they used was objectively reasonable from the viewpoint of a reasonable officer. It appears that both the defendants *and* the plaintiff feel that to decide whether the defendants had probable cause to arrest the plaintiff and whether the force they used was objectively reasonable, the jury needs to know the DAAT standards (and, in the plaintiff's case, standards used in other jurisdictions). It is not clear to the court why they feel that way.

Juries use their everyday experiences and common sense to decide questions of probable cause and reasonableness. The kind of "bare hand" encounter that forms the basis for this case is the kind of encounter that the Florek court concluded did not require experts. 649 F.3d at 602–03. The jury's everyday experience will be enough to allow it to assess and decide the issues.

Thompson v. City of Chicago, 472 F.3d 444 (7th Cir. 2006), is instructive in the context of the excessive force claim. The Thompson court considered expert testimony on excessive force in the context of Fed. R. Evid. 403. Id. at 457–58. Although the court was analyzing the testimony under Rule 403, the following passage is instructive in determining whether expert testimony on excessive force may be helpful to a jury in the Rule 702 context:

> . . . the question of whether a police officer has used excessive force in arresting a suspect is a fact-intensive inquiry turning on the reasonableness of the particular officer's actions in light of the particular facts and circumstances of the situation faced. *See, e.g., DeLuna* [*v. City of Rockford, Ill.*], 447 F.3d [1008,] at 1010 [(7th Cir. 2006)]. What is reasonable under any particular set of facts is "not

> capable of precise definition or mechanical application." *Abdullahi* [*v. City of Madison*, 423 F.3d [763,] at 768[ (7th Cir. 2005)]. Accordingly, whatever insight [expert witnesses] might have had into whether or why Officer Hespe used excessive force would have been of little value except as to possibly causing confusion and bore a substantial risk of prejudice. The jury, after having heard all of the evidence presented, was in as good a position as the experts to judge whether the force used by the officers to subdue Thompson was objectively reasonable given the circumstances in this case. Introducing two experts to testify that Officer Hespe used excessive force would have induced the jurors to substitute their own independent conclusions for that of the experts. In other words, they would have been "induced to decide the case on an improper basis . . . rather than on the evidence presented . . . ," which is precisely why the evidence should have been excluded. [*United States v.*] *Connelly*, 874 F.2d [412,] at 418 [(7th Cir. 1989)].

Id. at 458. Here, as in Thompson, the jury will be capable of determining whether the officers' use of force was reasonable without the experts' testimony.

In Brown, the Seventh Circuit offered more insight into this issue and on Thompson:

> Despite its strong language, *Thompson* should not be understood as establishing a rule that evidence of police policy or procedure will *never* be relevant to the objective-reasonableness inquiry. We recently clarified that expert testimony concerning police policy is not categorically barred. *See Florek v. Village of Mundelein*, 649 F.3d 594, 602-03 (7th Cir. 2011). Even though jurors can understand the concept of reasonableness, in some cases they may not fully grasp particular techniques or equipment used by police officers in the field. In those instances an expert's specialized knowledge can "help the trier of fact to understand the evidence or to determine a fact in issue," as Rule 702 requires. Fed. R. Evid. 702(a).
>
> Expert testimony of this type may be relevant in cases where specialized knowledge of law-enforcement custom or training would assist the jury in understanding the facts or resolving the contested issue.

Brown, 871 F.3d at 537-38. As the court has said, here there are no specialized techniques, customs or training that the jury would need expert guidance to understand.

The jury likewise can decide probable cause and reasonable suspicion without the aid of expert testimony. As was true in Carter, a jury in this case would not need to know or understand best police practices or departmental procedures to determine whether the officers could "point to specific and articulable facts which, taken together with rational inference from those facts, reasonably warrant [an] intrusion," Carter, 114 F.4th at 880 (quoting United States v. Pace, 48 F.4th 741, 749 (7th Cir. 2022)), and to determine "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." Abbott v. Sangamon C'nty, Ill., 705 F.3d 706, 714 (7th Cir. 2013). The jury will be made up of prudent people able to judge for themselves whether reasonable suspicion or probable cause existed.

The court agrees with the parties that both experts offer legal conclusions and instructions on the law for both the false arrest claim and the excessive force claim. Indeed, both parties' experts are guilty of doing what the parties accuse their opponent's expert of doing. Both parties loudly object to the other's expert stating opinions or conclusions about whether there was or was not reasonable suspicion, probable cause and objectively reasonable use of force. Both object to the other's expert characterizing actions as legal or illegal,

constitutional or unconstitutional. All the while, their own experts are doing the very thing to which they object. But the parties' insistence that each needs to call an expert witness to explain police training and procedures to the jury begs the question of how the testimony the experts offer would be helpful to a jury—a question the court may address *sua sponte*. See Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 704 (7th Cir. 2009) (courts can *sua sponte* consider the admissibility of expert testimony).

The court will exclude *both* experts in their entirety, but will do so without prejudice. The parties did not rely on their experts' opinions in their summary judgment briefs, so the court will set a date for delivering an oral ruling on the defendants' summary judgment motion. Once the court has ruled, the parties may ask the court to reconsider its ruling excluding the two experts, *as long as* the parties first meet and confer to come to some agreement about the topics on which the experts will provide testimony. If the parties seek reconsideration, the court will expect them to provide a detailed explanation of why expert testimony about police procedure is relevant or necessary in the context of the facts alleged here.

## V. Conclusion

The court **GRANTS** the plaintiff's motion to exclude Wahl's testimony. Dkt. No. 33.

The court **GRANTS** the defendants' motion to exclude Hilden's testimony. Dkt. No. 38.

The court **EXCLUDES** both Victor Wahl and Scott Hilden from testifying as experts.

The court **ORDERS** that the parties must appear for a telephonic hearing on **September 28, 2026 at 1:30 PM**, so that the court may provide an oral ruling on the defendants' motion for summary judgment. The parties are to appear by calling the court's conference line at 551-285-1373 and entering Meeting ID 161 4901 8989 and Passcode 190021 when prompted.

Dated in Milwaukee, Wisconsin this 11th day of August, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**